UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| JOHN GUNSALUS, | |
| Plaintiff, | **AMENDED COMPLAINT** |
| -against- | Jury Trial Demanded |
| CITY OF SYRACUSE, NEW YORK; and JOHN DOE(S) and/or JANE DOE(S), in their individual and official capacities as officials, officers, agents, employees, and/or representatives of the CITY OF SYRACUSE and/or the SYRACUSE POLICE DEPARTMENT, | 5:21-cv-01188 (GLS/ATB) |
| Defendants. | |

_____

Plaintiff JOHN GUNSALUS, by and through his attorneys, Bosman Law, L.L.C., as and for an Amended Complaint against Defendants, CITY OF SYRACUSE, NEW YORK and JOHN DOE(S) and/or JANE DOE(S), in their individual and official capacities as officials, officers, agents, employees, and/or representatives of the CITY OF SYRACUSE and/or the SYRACUSE POLICE DEPARTMENT, alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action under the Rehabilitation Act, 29 U.S.C. § 793(c) ("Rehabilitation Act").

## JURISDICTION

2. The Court may properly exercise jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1331.

## VENUE

3. Venue is proper in the Northern District of New York pursuant to the provisions of 28

U.S.C. § 1391.

## PARTIES

4. Plaintiff, John Gunsalus, at all times relevant to this Complaint, is a citizen of the United States and a resident of the County of Onondaga and State of New York.

5. Plaintiff was at all times relevant herein an employee or former employee of the City of Syracuse and the Syracuse Police Department. He began employment with the City of Syracuse as a police officer on or about July 30, 2004.

6. Defendant, City of Syracuse (at times referred to herein as "the City") is a municipal corporation organized and existing under the laws of the State of New York and at all relevant times had its principal place of business at City Hall, 233 E. Washington Street, Syracuse, New York.

7. The City of Syracuse Police Department is part of the municipal corporation of the City of Syracuse, organized and existing under the laws of the State of New York and at all relevant times had its principal place of business at 511 South State Street, Syracuse, New York.

8. Defendants John Does and Jane Does are individuals not yet known to the Plaintiff. Once their identities are ascertained, the names of those individuals will be substituted in place of the John Does and Jane Does designation(s).

## GOVERNING LAWS AND REGULATIONS

9. This action is related to Plaintiff's employment as a police officer with the City of Syracuse and the injuries he sustained in the performance of his duties and as a result of the conduct of the Defendants. As explained more fully below, Plaintiff was subjected to discrimination on the basis of disability in the administration of his disability benefits under New

York General Municipal Law Section 207-c (Section 207-c).

10.  Section 207-c provides, in relevant part: "[p]ayment of salary, wages, medical and hospital expenses of policemen with injuries or illness incurred in the performance of duties." Specifically, a municipality is statutorily liable for "... the full amount of [a policeman's] regular salary or wages ... and **all medical treatment and hospital care necessitated by reason of such injury or illness.**" Section 207-c(1) (emphasis added).

11.  Section 207-c was enacted to "compensate police officers for job-related injury or illness, in consideration for the hazardous conditions under which they serve." City of Watertown v. State of New York Public Employment Relations Board, 95 N.Y.2d 73 (2000) (citing Delanoy Letter, Rules Comm. Report, Bill Jacket, L 1961, ch 920).  This statute was created to mirror the successes of 207-a and to fix "substantial problems" in the administration of benefits.  See L 1961, ch 920; L 1938, ch 562, § 1; see also Governor's Mem approving L 1961, ch 920, 1961 McKinney's Session Laws of NY, at 2141.

12.  Section 207-c is "a remedial statute enacted for the benefit of law enforcement personnel injured in the line of duty, and as such is to be liberally construed in their favor." Miller v. City of Poughkeepsie, 185 A.D.2d 594, 595 (N.Y. App. Div., 3d Dept., 1992) (quoting Matter of Crawford v. Sheriff's Dept., 152 A.D.2d 382, 385 (N.Y. App. Div., 2d Dept. 1989), lv. denied 76 N.Y.2d 704 (1990)).

13.  "The right of a disabled officer to receive section 207-c disability payments constitutes a property interest giving rise to procedural due process protection, under the Fourteenth Amendment, before those payments are terminated." Matter of Park v. Kapica, 8 N.Y.3d 302, 310 (N.Y. Ct. of App. 2007) (internal quotation and citations omitted).

14. Additionally, as a recipient of Federal financial assistance, the City of Syracuse must adhere to the nondiscrimination provisions of Section 504 of the Rehabilitation Act in its administration of 207-c benefits and its treatment of officers.

15. Under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705 (20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. Section 794(a).

16. "The standards used to determine whether [the Rehabilitation Act] has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections related to employment." 29 U.S.C. Section 794(d).

17. Under the Americans with Disabilities Act (ADA), "[i]t is unlawful for a covered entity to discriminate on the basis of disability against a qualified individual in regard to ... term[s], condition[s], or privilege[s] of employment." 29 C.F.R. Section 1630.4(a)(1)(i) through (ix).

18. *Inter alia*, "[i]t is unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the

accommodation would impose an undue hardship on the operation of its business." 29 C.F.R. Section 1630.9(a).

19. Further, "[i]t is unlawful for a covered entity to use standards, criteria, or methods of administration, which are not job-related and consistent with business necessity, and: (a) That have the effect of discriminating on the basis of disability; or (b) That perpetuate the discrimination of others who are subject to common administrative control." 29 C.F.R. Section 1630.7.

20. Moreover, "[i]t is unlawful for a covered entity to participate in a contractual or other arrangement or relationship that has the effect of subjecting the covered entity's own qualified applicant or employee with a disability to the discrimination prohibited by this part." 29 C.F.R. Section 1630.6(a).

## **FACTS**

21. Plaintiff was injured in the performance of his police officer duties on or about April 30, 2018 in the course of an arrest.

22. On said date, Plaintiff was taken by ambulance to the Emergency Room because of debilitating back pain and thereafter taken out of work by his treating healthcare provider.

23. After undergoing testing, Plaintiff was diagnosed with having a intervertebral disc disorder with radiculopathy in the lumbar region.

24. Plaintiff's medical condition is a physiological disorder or condition affecting the neurological and musculoskeletal body systems and constitutes a physical impairment under the ADA and therefore the Rehabilitation Act.

25. At all times relevant hereto, Plaintiff's physical impairment substantially limited his

ability to care for himself, perform manual tasks, sleep, walk, stand, sit, reach, lift, bend, and work.  As such, Plaintiff is an individual with a disability as defined by the ADA and therefore the Rehabilitation Act.

26.  Plaintiff was deemed by his treating healthcare provider to be totally temporarily unable to work starting in April 2018.  Plaintiff applied for benefits under Section 207-c and was deemed by the City entitled to same on or about June 11, 2018.  He received regular payment of his wages and physical therapy sessions under Section 207-c from April through November 2018.  On information and belief, all Plaintiff's doctor's medical appointment records are timely faxed or sent to the Syracuse Police Department following his visits.

27.  On or about November 2018, Plaintiff's healthcare provider released him to work light-duty with accommodations, effective November 29, 2018, although Plaintiff's healthcare provider prescribed continuing physical therapy and also massage therapy to treat his work-related injury.

28.  On or about November 29, 2018, Plaintiff returned to work light-duty.  However, because of pain from his injury, he could not continue working in the light-duty assignment.

29.  Therefore, on or about January 10, 2019, Plaintiff was excused from work by his treating healthcare provider.  At this time, Plaintiff's healthcare provider prescribed continuing physical therapy and "work hardening" therapy for his work-related injury. "Work hardening" is an intensive four-hour physical therapy program in Rochester, New York.

30.  This work hardening therapy was prescribed for Plaintiff's work-related injury to improve his overall physical well-being and conditioning.

31.  From on or about January 10, 2019 through on or about June 28, 2019, Plaintiff

received regular payment of his wages and physical therapy and work hardening therapy sessions under Section 207-c.

32. On or about March 21, 2019, Plaintiff was ordered by Defendants to undergo an examination relating to his work-related injuries. Pursuant to a certified letter of said date, Plaintiff was advised to appear for an examination to be conducted by Daniel Carr, M.D. on April 25, 2019. Plaintiff attended that examination.

33. On or about May 3, 2019, Plaintiff had a doctor's appointment with his treating physician. She opined that Plaintiff should not be working. She did not release him to work in any capacity. Plaintiff's physician's medical record refusing to return him to work from May 3, 2019 was sent to Defendants on or about that date.

34. In spite of Plaintiff's treating physician's opinion, Defendants, by letter dated May 8, 2019, ordered Plaintiff to return to work on a "light-duty restricted status" beginning May 13, 2019, based on Dr. Carr's report.

35. The letter did not advise Plaintiff of any rights to challenge or appeal said order and Plaintiff was unaware of any such procedure. Additionally, Defendants failed to notify Plaintiff of their 207-c policy, including its "appeal" provisions and/or time limits therefor. Finally, Defendants did not make said policy available to officers until on or about December 2020 when it was uploaded to the database that contains all of the Department's rules, regulations and policies.

36. After receiving the May 8th letter, Plaintiff contacted his Union representative, Jeffrey Piedmonte. Plaintiff advised Mr. Piedmonte that he had met with his physician on May 3, 2019 and that his physician did not authorize any return to work, regular or "light-duty." Mr.

Piedmonte advised Plaintiff to contact his treating physician and have her re-submit the medical record from May 3, 2019. Mr. Piedmonte indicated that doing so would allow Plaintiff to remain out of work as a note from Plaintiff's physician would "supercede" Dr. Carr's report. Mr. Piedmonte further advised Plaintiff to contact the Human Resources Department and confirm that they received the May 3 medical record.

37. After Plaintiff's treating physician re-submitted the medical record from the May 3, 2019 visit, Plaintiff contacted the Human Resources Division of the Syracuse Police Department and spoke with Wendy Murphy. Ms. Murphy acknowledged receipt of Plaintiff's physician's medical record of May 3, 2019 and stated that Plaintiff was "all set." Thereafter, Plaintiff contacted Mr. Piedmonte who advised that he had spoken with then Deputy Chief Cecile and Cecile also indicated that Plaintiff was "all set." Plaintiff relied on these representations and believed that he was not required to return to work on May 13 as directed in the May 8, 2019 letter.

38. On or about June 28, 2019, Plaintiff had a doctor's appointment with his treating physician. Beginning that date, Plaintiff's healthcare provider authorized him to resume light-duty work but such authorization was expressly conditioned upon Plaintiff attending work hardening and physical therapy three times per week intermittently with his work schedule.

39. On or July 3, 2019, Plaintiff received a letter from Deputy Chief Cecile. The letter alluded to a "207 procedure" but did not provide a copy of it. This was the first time that Plaintiff learned of the existence of any "207 procedure" or policy. Cecile's letter rejected both the May 3, 2019 and June 28, 2019 medical treatment records of Plaintiff's treating physician as out of compliance with said "procedure." The July 3 letter advised, for the first time, that the

May 3, 2019 return to work order was "final and binding" and ordered Plaintiff to return to work light duty on July 8, 2019.

40. Defendants thereafter applied the light-duty conditions, retreated from their position and agreed to allow Plaintiff to return to work under the conditions of his physician's order. Plaintiff returned to work light-duty on or about July 8, 2019 for two non-consecutive days a week. The remaining three days he participated in work hardening ~~and~~ physical therapy sessions, as prescribed by his doctor.

41. From on or about June 28, 2019 through on or about November 2019, Plaintiff received regular payment of his wages and attended work hardening sessions as statutorily provided for under Section 207-c.

42. On or about June 2019, Plaintiff was deemed to require and prescribed a medical lift assist chair due to disabling complications arising from his work-related injury and disability. Defendants refused to approve and blocked the prescription for said chair. Upon information and belief, Defendants refused to authorize such habilitative device based on Plaintiff's disability. Plaintiff raised this issue to Syracuse Police Department agents, including, but not limited to, Deputy Chiefs Cecile and Shoff, Wendy Murphy, Susan Izzo, and his Union, to no avail.

43. Plaintiff was again ordered, on or about October 3, 2019, to undergo another examination to take place on October 21, 2019, also with Dr. Carr. This examination was purportedly for approval of further work hardening therapy. Plaintiff attended this examination as scheduled. At the October 21 2019 examination, Dr. Carr admitted to Plaintiff that he agreed with the diagnosis by Plaintiff's personal healthcare provider and approved of the work hardening therapy that had been prescribed by his treating healthcare provider. At this examination,

Plaintiff discussed with Dr. Carr that he had not yet improved to the point he had hoped and he was considering applying for disability retirement. Despite numerous demands to Dr. Carr's office and agents of the Syracuse Police Department, Plaintiff was not timely provided a copy of Dr. Carr's report of this examination. In or about the Spring of 2020, Plaintiff was finally provided a copy and the report indicates that Dr. Carr was "unable to predict when his restrictions would end and if they would end. It is beginning to look like he will not be able to overcome this problem and work without restrictions, particularly the repetitive axial loading of the spine, such as running and jumping activities."

44. While Plaintiff's work hardening physical therapy was approved through November 2019, Defendants failed and refused to authorize further therapy in or about November 2019, contrary to the requests and recommendations of Plaintiff's medical providers that were, as later learned by Plaintiff, also approved by Dr. Carr. The discontinuance of Plaintiff's physical therapy was done without due process and constitutes a violation of his rights. Upon information and belief, Defendants refused to authorize such therapy based on their perception that Plaintiff would not be able to return to full duty as a police officer due to his disability and medical conditions. As a result, Plaintiff was not able to continue this therapy, causing physical injury, suffering, and significant regression of his condition.

45. Due to the lack of continuing therapy, Plaintiff's doctor then advised him that he should no longer work at all. Additionally, Defendants failed to approve, and thus prevented, Plaintiff's prescribed nerve conduction testing. Such testing was necessary for Plaintiff's medical providers to determine his "maximum medical improvement" (MMI). It was important for Plaintiff's doctors to determine his MMI in order to properly plan his future treatment.

46. By letter dated January 28, 2020, received February 1, 2020, Defendants notified Plaintiff for the first time that his accrued leave credits were charged for the time he was not at work since November 15, 2019 purportedly because Plaintiff had not attended his physical therapy, refused by Defendants, since that date. The multiple efforts by Plaintiff to obtain approval for prescribed therapy since November 2019 were ignored, blocked and/or denied by Defendants. The application of accrued leave instead of 207-c coverage was also done without notice or due process and constitutes a termination of existing benefits, not a denial of benefits never previously awarded. Plaintiff disputed the charging of leave credits in February 2020 and was advised it would be under review by Cecile.

47. Plaintiff was notified on or about March 2, 2020 of a third medical examination with Dr. Carr to take place on March 30, 2020. Plaintiff was concerned about attending this examination as scheduled due to the COVID-19 pandemic and the "New York State on PAUSE" stay at home order. Of greater concern, Plaintiff's wife had recently undergone surgery and, as such, was particularly at risk from COVID-19. To this end, Plaintiff contacted Cecile and Shoff by email on March 24, 2020. By this email, he requested, *inter alia*, the rescheduling of this examination. In response, by letter dated March 26, 2020, Shoff advised that Defendants would agree to "adjourn" the medical examination. According to this letter, Plaintiff's "previous request to work only two days per week" and his "recent request to be removed from work entirely until May 1st [2020]" would be placed "on hold" as a result of the postponement of the medical examination. Such conduct constitutes a violation of Plaintiff's rights.

48. The "previous request" to work only two days per week intermittently with therapy existed *before* the October 2019 medical examination where Dr. Carr indicated that he approved

of the prescribed work hardening therapy. Shoff's letter again stated that Plaintiff's accrued leave would be used because he was "not working" and falsely reported that "the work hardening program released" him. Plaintiff was never "released" from the therapy program. He was not able to attend his work hardening therapy since November 2019 due to Defendants' repeated interference with Plaintiff's treatment and blocking same. The "recent request" to cease working entirely was made due to Defendants' repeated failures to authorize Plaintiff's continuing therapy causing and continuing to cause Plaintiff excruciating pain and suffering.

49. On May 11, 2020, Plaintiff attended his third examination with Dr. Carr. During this visit, Dr. Carr confirmed to Plaintiff that he was unable to provide him with the report from the October 2019 examination. Dr. Carr admitted to Plaintiff that in the October 2019 report he provided to Defendants he recommended continuing physical therapy as prescribed and requested. Dr. Carr further advised that his recommendation to Defendants would be the same in his report and that Plaintiff's therapy should be approved as prescribed by his personal medical providers.

50. Notwithstanding Dr. Carr's admissions and opinions that he should receive the therapies prescribed by his treating healthcare provider, Defendants continued to refuse to authorize work hardening physical therapy for Plaintiff. Upon information and belief, Defendants refused to authorize such therapy based on Plaintiff's disability.

51. On or about June 3, 2020, Plaintiff served a Notice of Claim on Defendant City of Syracuse with respect to the administration of his 207-c benefits.

52. On or about June 10, 2020, Plaintiff's doctor changed Plaintiff's restrictions and took him out of work because of his decline without the previously prescribed therapy.

53. On or about August 12, 2020, Shoff sent Plaintiff a letter, received August 15, 2020, advising that he was required to report to work, stating that Dr. Carr "finds that you are still able to work a modified duty job per the restrictions upon which you were ordered to return to work last May 8, 2019." He further indicated that Plaintiff had exhausted his earned leave credits and would be carried on leave without pay.

54. In Defendant Shoff's letter he referenced "addendums" to Dr. Carr's May 11th 2020 examination. These "addendums" indicate that Defendants falsely advised Dr. Carr that Plaintiff no longer needed or was "released" from the work hardening program.

55. On or about August 18, 2020, Plaintiff responded to Shoff's letter, stating, among other things, "I would like to reiterate that I have never been released from any therapy programs by my doctor, but instead SPD/ "The City" has not approved such therapy longer than three weeks and/or ignored requests to continue therapy and prescriptions therefore after those three weeks." Plaintiff advised Defendants that he had seen his doctor on that August 18, 2020 date and his doctor continued to limit him to "out of work status." Plaintiff further advised that the City had falsely told the IME that he had been "released" from therapy and demanded a hearing. No hearing was provided.

56. On or about September 2, 2020, Plaintiff again e-mailed Cecile and Shoff, stating, among other things, "In a previous letter from Deputy Chief Shoff, he stated that my 207c benefits/pay would be terminated if I did not return to work. In the meantime there has not been further discussion about my 207c/pay status since my last medical visits. My provider states in her report to remain in an "out of work" status do to objective findings. I have and continue to ask for a hearing as entitled before any 207c benefits/pay be terminated."

57. On or about September 3, 2020, Plaintiff's pay was stopped but no hearing was afforded to him.

58. On or about September 4, 2020, Plaintiff received a letter from Cecile. The letter states, *inter alia*, "you were ordered to work light duty on May of 2019. You submitted medical appealing that order and the City denied your appeal on July 3, 2019. You did not further appeal from that denial." The letter further states, "[a]s the return to work order from May of 2019 was never successfully appealed by you, that order remains in effect." Plaintiff was unaware and never previously notified of his rights or the need to appeal the May 2019 order, particularly since they informally "changed" the order to allow the therapy three days and work two days, as prescribed by his doctor and as recommended by their October 2019 IME.

59. The September 4 letter states, "If you have had a change in condition that no longer allows you to work a light duty assignment, you need to file a 207 application asserting the change in condition and set forth the "re-injury" or "aggravation" that has caused your condition to change ..."

60. On or about said date, Plaintiff, as directed, re-filed an application for Section 207-c benefits based on a recurrence/exacerbation of his injury. Plaintiff's condition deteriorated due to Defendants' actions and refusal to authorize needed therapies.

61. On or about December 16, 2020, Plaintiff was examined under oath by Defendants' counsel pursuant to New York General Municipal Law Section 50-h and provided testimony concerning his 207-c benefits.

62. On or about March 25, 2021, Cecile wrote Plaintiff a letter denying his September 2020 application for Section 207-c benefits.

63. Thereafter, Plaintiff sent a letter objecting to the denial.

64. A hearing under the City's "207-c policy" was then scheduled by Defendants for August 6, 2021. Plaintiff requested representation at this hearing from his Union but the Union refused and therefore breached its duty of fair representation.

65. This "207-c policy" is an agreement between the City of Syracuse and the Syracuse Police Benevolent Association, Inc. without any notice to Plaintiff in advance of such agreement.

66. Under the 207-c policy, which applies to "all claims for GML Section 207-c benefits brought after [May 28, 2009]," the officer must not only carry the burden of proof at an arbitration but must meet the demanding arbitrary and capricious standard of review under Article 78 of the New York Civil Practice Law and Rules (CPLR). Additionally, the officer becomes liable for the fees and expenses of the arbitrator and stenographer. Furthermore, the Union waived, without consideration and in violation of its duty of fair representation, rights and benefits under Section 207-c, including the right to receive payment of wages pending review of a return to work directive without incurring an obligation to re-pay such wages should the officer's challenge to such directive be unsuccessful.

67. The City's policy also denies due process as it prevents the officer from providing proof of approvals. To wit, the City's 207-c policy provides: "The City's decision to provisionally pay medical bills and/or to provide paid medical leave shall not be admissible as evidence in any hearing resulting from the denial of 207-C benefits." This makes the proceeding nothing more than a hollow and futile exercise for the officer. These prohibitions and exclusion of evidence make the arbitration proceeding one-sided, fundamentally unfair, and inadequate to serve as a constitutionally sound due process hearing.

68. On August 6, 2021, Plaintiff and his counsel attended the hearing and made due process objections to the proceeding.  A letter explaining these objections was also provided to the arbitrator and the City's counsel at the hearing.

69. The arbitrator adjourned the hearing to allow Plaintiff to bring the instant action to challenge the 207-c policy's provisions.

## AS AND FOR A FIRST CAUSE OF ACTION UNDER THE REHABILITATION ACT FOR DISABILITY DISCRIMINATION

70. Plaintiff repeats and re-alleges paragraphs "1" through "69" as if set forth fully herein.

71. Defendant City of Syracuse deprived Plaintiff of his rights to a reasonable accommodation by, *inter alia*, refusing to authorize his work hardening therapy and refusing necessary habilitative devices while still expecting him to work.

72. As a direct and proximate result of Defendants' deprivation of Plaintiff's statutory rights, Plaintiff has been denied wages and medically necessary treatment and therapies; exacerbation of his injuries and pain; lasting and permanent disability and injury; subjected to pain and suffering, physical and emotional injury and harm, loss of enjoyment of life; and incurred legal fees and costs and it entitled to compensation therefor.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants, jointly and severally, as follows:

(a) judgment awarding Plaintiff compensatory damages for each and every injury and cause of action herein in an amount to be decided at the trial of this action;

(b) granting injunctive relief requiring Defendants to provide a constitutionally adequate hearing and otherwise requiring Defendants to refrain from violating Plaintiff's rights;

(c) prejudgment interest on all amounts due;

(d) attorneys' fees and costs of suit under applicable law;

(e) declaratory relief that the City's 207-c policy is unconstitutional as written and applied and that Defendants have violated Plaintiff's rights under the law;

(f) punitive damages; and

(g) granting such other and further relief as the court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Dated: April 21, 2023                                                       s/A.J. Bosman

                                                                                                                                                                                         _____

A.J. Bosman, Esq.
Robert Strum, Esq.
Bosman Law, L.L.C.
Attorneys for Plaintiff
3000 McConnellsville Road
Blossvale, New York 13308
Tel. (315) 820-4417